**In re Kevin ADELL, Debtor.**

**No. 9:03–bk–23684–ALP.**

United States Bankruptcy Court,
M.D. Florida,
Ft. Myers Division.

May 28, 2004.

Asher Rabinowitz, Ruden, McClosky et al., Dawn A. Carapella, Trenam Kemker et al., Roberta A. Colton, Tampa, FL, for Debtor.

T. Patrick Tinker, Office of the U.S. Trustee, Tampa, FL, for U.S. Trustee.

## ORDER ON MOTION TO DISMISS
(Doc. No. 145)

ALEXANDER L. PASKAY, Chief Judge.

It is not unusual, as a matter of fact, it is quite common that debtors who are about to lose their homes seek refuge in the court of last resort, which is the Bankruptcy Court. While it is true that this happens as a general rule in Chapter 13 cases, there is nothing in the Bankruptcy Code, which prohibits an individual debtor who is eligible for relief under Chapter 11, to file a Petition for the same reason, even if that is the paramount and at times, the only reason to do so. It cannot be gainsaid that the threat of the loss of a home due to a pending mortgage foreclosure or actually threat of an immediate foreclosure sale, prompts the debtor to seek relief in the bankruptcy court. However, it is clear that basically there is no difference when a debtor files a Petition to save the home when it is threatened by loss by a judgment creditor who is aggressively pursuing an attempt to obtain satisfaction of a judgment by liquidating all assets of the debtor, including the family home, or when the loss of the home is at a foreclosure sale. The fact that the debtor is able to pay his debts as they mature and that the debtor is solvent is of no consequence, especially when the debtor is rendered hopelessly insolvent by the entry of a money judgment in a very large amount. It is well established that the mere fact that the bankruptcy Petition thwarts a judgment creditor in its attempt to enforce a valid legal right is no basis alone to deny the relief sought by the debtor provided that the debtor has an honest intention and a real need for relief and the ability to obtain relief under the provisions of Chapter 11 of the Code.

The instant matter under consideration is a Motion to Dismiss (Doc. No. 145) this Chapter 11 case of Kevin Adell (Debtor), which is filed by John Richards Homes Building Company, L.L.C. (JRH), a judgment creditor of the Debtor. JRH obtained a judgment in the bankruptcy court, in the Eastern District of Michigan, against the Debtor in the amount of $4,100,000, as compensatory and $2,000,000, as punitive, plus attorney's fees in the amount of $313,230.68, for a total of approximately $6.4 million. In due course, this Court scheduled a preliminary hearing on the Motion to Dismiss, at the conclusion of which, this Court entered an order (Doc. No. 219), which specified the following is-

sues to be tried at a final evidentiary hearing:

(1) the alleged bad faith aspect of the filing of this Chapter 11 case, including but not limited to the intent of the Debtor to abuse the judicial process; and

(2) the Debtor's attempts to frustrate the legitimate efforts of JRH in enforcing its rights against the Debtor by filing this Chapter 11 case.

At the duly scheduled final evidentiary hearing, the following facts have been established by documentary evidence and testimony of witnesses relevant to the two issues outlined above.

The Debtor is a highly successful executive and at the time of filing, he was and still is, the officer of the following corporations: Adell Broadcasting Corp.; STN. com, Inc.; The Word Network; and Cubana One Network. In the year 2000, his annual gross income was $935,660; in 2001, $2,277,724; in 2002, $1,705,683; in 2003, $1,700,000; and in the first part of 2004, $380,000.

Upon reviewing an ad promoting the sale of custom-built homes by JRH, the Debtor inquired about the possibility of having a home constructed by JRH. The parties met and discussed the price. JRH wanted $4 million and the Debtor was only willing to pay $3 million. After a few meetings, they agreed on a price and the Debtor signed a contract with JRH for the construction of the home for $3,030,000. The home was to be constructed within one year. The Debtor paid JRH a $600,000 down. When JRH found out that it did not own the lot but only had an option to buy it, JRH asked the Debtor for more money to purchase the lot. The Debtor gave JRH $1,200,000 more or $1,800,000 total. The Debtor assumed that JRH had already started construction, and when he found out that construction

had not yet begun; the Debtor demanded the return of the funds he already paid.

JRH refused and litigation ensued, initially commenced by the Debtor, who was attempting to recover the down payment from JRH. The suit was filed in the state court in the State of Michigan, which was removed by JRH to the district court where the suit is still pending. The Debtor was advised by an attorney, for whatever reason, that he would obtain greater success if he filed an involuntary petition under Section 303 of the Code against JRH. Following that advice, the Debtor did file an involuntary petition in the Eastern District of Michigan. The Petition was immediately attacked by JRH with the filing of a Motion to Dismiss the Involuntary Case and a Motion for Compensation and Punitive Damages. JRH, in its Motion, contended that the involuntary petition was improper because only one petitioning creditor filed it and JRH has more than twelve creditors. The Bankruptcy Court in the Eastern District of Michigan considered the Motion in due course and on July 15, 2002, entered an order (Doc. No. 29, in the involuntary of JRH) and dismissed the involuntary case. The Bankruptcy Court expressly reserved jurisdiction to consider the Motion for Compensation and Punitive Damages against the Debtor pursuant to Section 303(i) of the Code.

That Motion was heard in due course and at the conclusion of the hearing, on April 25, 2003, the Bankruptcy Court entered an order and awarded sanctions against the Debtor for a total of $6,413,230.68 (Sanction Award). The entry of the Sanction Award generated a flurry of motions filed by JRH who immediately took steps to enforce the Sanction Award. For instance, JRH requested issuance in excess of 32 writs of garnishment beginning on May 12, 2003. In the

interim, JRH was successful to cause the Debtor's personal properties to be seized in Michigan, which was ultimately sold by the U.S. Marshall, without notice to the Debtor.

The record reveals that after the entry of the Sanction Award, the Debtor sold approximately eleven to thirteen high-end vintage cars for $536,000, which according to the Debtor, were worth at least $700,000 to $800,000; cashed in Treasury bills in the amount of $1,700,000; and wire transferred these funds to his attorney's in Florida, including $300,000 he withdrew from his checking account.

The Debtor arrived in Florida on May 5, 2003. On May 6, 2003, he engaged the services of a real estate broker, and immediately took steps to establish his residency in Florida. He registered to vote in Florida, he registered his automobile in Florida, and he obtained a fishing license. After spending the day looking at thirteen houses, he signed a contract to purchase a house for $2.8 million. The record reflects that the funds he had previously transferred to his attorney in Florida were not enough. He was short $400,000. He called his father and asked him to lend him the shortfall of $400,000. His father agreed and wired the sum to his son's attorney in Florida. The contract was signed on May 7, 2003, and the deal was closed on May 8, 2003, or two days after he found the house.

On May 19, 2003, the Debtor filed a suit for declaratory relief in the Circuit Court in and for Collier County, seeking a determination that the property he just bought qualified for the protection granted to homesteads by Art. X, Sec. 4 of the Florida Constitution. JRH removed the declaratory relief action to the Bankruptcy Court for the Middle District of Florida, even though at that time, there was no bankruptcy case pending in this District. JRH promptly filed a motion to transfer the removed action to the Eastern District of Michigan, which was granted and the suit was transferred to the Eastern District of Michigan on June 9, 2003.

On May 21, 2003, JRH filed a motion for miscellaneous post-judgment relief and sought an order from the Bankruptcy Court to force a sale of the Naples residence of the Debtor. The Debtor, who claimed that the home was homestead and could not be reached by creditors of the homeowner, resisted the motion. JRH also requested an order requiring the Debtor to turn over certain personal property to the U.S. Marshal. Additionally, JRH sought an order requiring the Michigan Secretary of the State to record liens on several of the Debtor's vehicles.

On September 17, 2003, the Bankruptcy Court in the Eastern District of Michigan entered an Order (Homestead Order) that determined that the home the Debtor purchased in Naples did not qualify as homestead because (1) whatever homesteads are available in Florida are trumped by Section 303(i) of the Code; and (2) the Debtor did not qualify for homestead because he was not a bona fide resident of Florida. The Bankruptcy Court ordered the Debtor to sell the home within 60 days and directed the Debtor to turn over some other properties to the U.S. Marshal. The Debtor did not sell the homestead but turned over a gold Rolex and gold money clip to the U.S. Marshal, which were sold.

The Debtor promptly appealed the Homestead Order and filed a Motion for Stay Pending Appeal. The Bankruptcy Court denied the Motion. On October 14, 2003, approximately one month after the Bankruptcy Court had rendered its decision; the Debtor filed an Emergency Motion for Stay Pending Appeal in the District Court. Counsel for the Debtor neither in the Motion for Stay filed in

the Bankruptcy Court nor the same Motion filed in the District Court, contended that the Debtor was unable to post a supersedeas bond. On November 10, 2003, the District court granted a Motion for Stay Pending Appeal, provided that the Debtor posts a cash bond in the amount of $2.8 million. The District Court later amended the original Order and clarified that the bond could be cash or a surety bond. Rather than post the bond, on November 14, 2003, three days before the expiration of the 60–day period, the Debtor filed his Petition for Relief under Chapter 11 in this Court, immediately triggering the operation of the automatic stay imposed by Section 362 of the Code. These are the relevant facts as established at the final evidentiary hearing to consider the Motion to Dismiss the Chapter 11 case by JRH.

■ The Motion to Dismiss (Doc. No. 145) is filed pursuant Section 1112(b) of the Code. This Section provides that a Chapter 11 case may be dismissed if the court finds that it is "in the best interest of creditors and the estate for cause." Thereafter, the Section lists ten specific grounds for dismissal. It is clear that the specifics are only illustrative and the term "cause" clearly includes lack of good faith and conversely the bad faith of the Debtor in filing the Petition for Relief under Chapter 11.

In support of its contention that the Debtor filed his Petition in bad faith JRH contends the following:

(1) The Debtor has few unsecured creditors whose claims are small in relation to the claims [sic] of the secured creditor;

(2) The Debtor's "feigned" financial problems involve essentially a dispute between the Debtor and JRH, which can be resolved in a non-bankruptcy proceeding;

(3) The timing of the Debtor's filing evidences an intent to delay or frustrate the legitimate efforts of the Debtor's secured creditors to enforce their rights;

(4) There could be no clearer example of a two-party dispute;

(5) If the claim of JRH is excluded, the Debtor has more than enough cash with which to pay his non-insider, non-lawyers debts;

(6) The Debtor's case lacks any realistic possibility of an effective reorganization; and

(7) The Debtor is seeking to use the provisions of the Bankruptcy Code to create and organize a new business, not to reorganize or rehabilitate an existing enterprise, or to preserve going concern values of an existing business.

On February 19, 2004, JRH filed an Amended Motion to Dismiss (Doc. No. 153). In its Amended Motion to Dismiss, JRH alleged in addition to the allegations set forth above that the Debtor sued Judge Rhodes and others in a mandamus action to prohibit Judge Rhodes from conducting hearings on the criminal contempt issue. Judge Paul Gadola set the hearing on the mandamus request for early March 2004.

The Debtor, in his Response (Doc. No. 168), while not denying most of the factual allegations, placed a totally different spin on the facts relied on by JRH; and denied that the Petition was filed in bad faith. Specifically, the Debtor contends that:

(1) he did not file his Petition in bad faith because chapter 11 remedies are available;

(2) he has substantial debts other then the debt owed to JRH that would require him to file chapter 11 due to

the constraints the Code places on filing chapter 13;

(3) the case is not a two-party dispute between the Debtor and JRH;

(4) the timing of the Debtor's filing, after he was required to post a bond as a condition to stay the Homestead Order, is not evidence of intent to delay or frustrate secured creditors, and does not taint the filing;

(5) he desires to use Chapter 11 so that he may reorganize and pay his obligations;

(6) he has a realistic possibility of an effective reorganization; and

(7) he is not seeking to use the bankruptcy provisions to create and organize a new business.

Additionally, the Debtor contends that filing bankruptcy to prevent the foreclosure of a home has never been evidence of bad faith. The Debtor claims that he needed to file Chapter 11 to reorganize his obligations and to keep his home.

■ The issue raised by the Motions under consideration has been considered under the Bankruptcy Act of 1898, even before the enactment of the Bankruptcy Code in 1978 ordinarily in Chapter X (corporate reorganization) cases. *Breeding Motor Freight Lines Inc. v. Reconstruction Finance Corp.*, 172 F.2d 416 (10th Cir.1949), *cert. den.*, 338 U.S. 814, 70 S.Ct. 54, 94 L.Ed. 493 (1949). In testing the good faith of the debtor to seek relief under Chapter X, courts emphasized that the real test is the presence of an honest intention of the debtor, an actual need, and the ability to effectuate the aim of reorganization. *In re Julius Roehrs Co.*, 115 F.2d 723 (3d Cir.1940). A statement by the Tenth Circuit in *Breeding Motor, supra*, a pre-Code case, still represents a viable principle. In this case, the Tenth Circuit stated that courts are "not required to retain on [their] docket a pro-

ceeding for reorganization which is merely a visionary or impractical scheme of resuscitation." *Breeding Motor*, 172 F.2d at 421. In the case of *In re Natural Land Corporation*, 825 F.2d 296 (11th Cir.1987), Judge Tjoflat speaking for the Eleventh Circuit, held that the taint of a petition filed in bad faith must naturally extend to any subsequent reorganization proposals thus any plan would fail to meet Section 1229(a)(3) of the Code, which requires that the plan submitted has been proposed in good faith. *Natural Land*, 825 F.2d at 298. The Eleventh Circuit noted that in light of this conclusion, it is doubtful that Congress intended that a creditor's right be delayed merely to allow the bad faith debtor to present a reorganization plan, which, as a matter of law, could not be approved, by the court.

■ Unlike Section 1129(a)(3) of the Code, which requires as condition precedent to confirmation of Chapter 11 Plan, a finding by the court that the plan was proposed in good faith, Section 1112(b) of the Code, which seeks dismissal or conversion of a Chapter 11 case, does not specify "bad faith" as a specific ground for the dismissal. Nevertheless, it can no longer be gainsaid that a petition, which is found to have been filed in "bad faith," could be dismissed for "cause." The legislative history relating to the adoption of Section 1112(b) of the Code leaves no doubt that in addition to the specific grounds set for the Section, the court may use its equitable power to prevent a misuse or abuse of the rehabilitative provisions of this Chapter. H.R. No. 95–595, 95th Cong., 1st Sess.1977 (1978 U.S.C.C.A.N. 5787). Courts now uniformly agree that "bad faith" justifies a dismissal of the Chapter 11 case for "cause." *In re Singer Furniture Acquisition Corp.*, 254 B.R. 46 (M.D.Fla.2000); *In re Albany Partners, Ltd.*, 749 F.2d 670 (11th Cir.1984); *In re Phoenix Piccadilly,*

*Ltd.,* 849 F.2d 1393 (11th Cir.1988); *Colonial Daytona Ltd. Partnership v. American Sav. of Fla., F.S.B.,* 152 B.R. 996 (M.D.Fla.1993); *In re Double W Enterprises, Inc.,* 240 B.R. 450 (Bankr.M.D.Fla. 1999); *In re Wells,* 227 B.R. 553 (Bankr. M.D.Fla.1998); *In re Boughton,* 243 B.R. 830 (Bankr.M.D.Fla.2000).

■ In considering a motion to dismiss a Chapter 11 case on the ground that a petition was filed in bad faith, the Eleventh Circuit held that the "courts may consider any factors which evidence an intent to abuse the judicial process and the purposes of the reorganization provisions or in particular factors, which evidence that the petition was filed 'to delay or frustrate the legitimate efforts of secured creditors to enforce their rights.'" *Phoenix Piccadilly, supra* quoting *Albany Partners supra.* By way of illustration, the Fifth Circuit in *Matter of Little Creek Development Co.,* 779 F.2d 1068 (5th Cir. 1986) set forth ten specific instances when dismissal may be warranted for "cause" and held that if any one of them has been established dismissal may be warranted. Following *Little Creek,* the Eleventh Circuit in the cases of *Natural Land, supra* and *Phoenix Piccadilly,* also set forth specifics of which would warrant to find "bad faith" and to dismiss the Chapter 11 case for "cause." The Eleventh Circuit as recently as this year held in the case of *In re State Street Houses, Inc.,* 356 F.3d 1345 (11th Cir.2004), that the factors set in forth in *Phoenix Piccadilly* are still appropriate.

The vast majority of the cases, which considered a motion to dismiss a Chapter 11 case, involved a debtor who faced a loss of real estate involved in a foreclosure commenced by the mortgagee. *Matter of Southern Communities Inc.,* 57 B.R. 215 (Bankr.M.D.Fla.1986); *Little Creek Development Corp., supra.*

The foregoing authorities discuss the factors that establish the elements of a bad faith filing:

(1) A two-party dispute already pending in a foreign forum may warrant a dismissal. *Singer Furniture Acquisition, supra.*

(2) A dispute between a debtor and a secured party in cases where the debtor had none or very few unsecured creditors;

(3) A case that includes the new debtor syndrome. *Natural Land, supra;* and

(4) A filing to escape the enforcement of a court contempt citation. *Matter of Winn,* 43 B.R. 25 (Bankr.M.D.Fla. 1984).

In *Winn,* this Court held that "an attempt by a Debtor to circumvent or escape the consequences of a contempt judgment issued by a court of competent jurisdiction was never a legitimate aim to be achieved by use of the rehabilitation provisions of this Chapter and without doubt constitutes an impermissible use of Chapter 11 of the Bankruptcy Code." *Winn,* 43 B.R. at 28. *See also Matter of Port Richey Service Co., Inc.,* 44 B.R. 634 (Bankr.M.D.Fla. 1984).

■ In the case presently before this Court, the Debtor cannot seriously dispute that the primary, if not the only reason he filed his Chapter 11 Petition was to prevent the enforcement of the Homestead Order, which directed the Debtor to sell his residence located in Naples, Florida. According to the Bankruptcy Court in Michigan, Art X, Sec. 4 of the Florida Constitution, did not protect the Debtor's Naples homestead. There is nothing in this record, which warrants the finding that the Debtor had any difficulty paying his debts when they became due when he filed his petition, except the Sanctions Award, or that the Debtor had any pres-

sure as a result of threats of litigation by creditors, other than the aggressive collection efforts of JRH.

Equally, it is fair to assume that the Debtor could have prevented the sale of · his residence by using the stay granted to him by the District Court by posting a supersedeas bond. While it is true that the original order granting the stay required the Debtor to post a cash bond, the ' Order was amended to permit the Debtor to post a surety bond in lieu of cash. It is without dispute that between September 17 and November 14, 2004, the day the Debtor filed his Chapter 11 Petition, the Debtor paid his attorneys in excess of $540,000 for their services, during the 60 day period, an amount more than sufficient to procure a surety bond, but opted to keep litigating in Michigan, in connection with the Sanction Award and the Homestead Order.

Considering the totality of the evidence, there is no question that this record more than justifies the findings that this is without doubt nothing more than a two-party dispute contrary to the Debtor's contention. The fact that the claim register reflects an aggregate general unsecured claim of $7,771,019.70, which includes the $6.4 million claim of JRH, is without significance. The bulk of the remainder of the unsecured claims is owed to insiders. There is nothing in this record which warrants the conclusion that but for the litigation with JRH, the Sanction Award and the Homestead Order, there would not have been any need to seek relief in the bankruptcy court. Moreover, the Debtor who had an income during the preceding three years in excess of close to seven million dollars, had any difficulty to meet his obligations as they became due; and that the principal if not the sole reason that Debtor filed his Chapter 11 case was

to prevent and avoid the possibility of the immediate loss of his Naples residence.

While his frustration with the treatment he received by the Bankruptcy Court in Michigan is understandable, this Court is not in a position to consider and take into account whether the Sanction Award and the decision of the Bankruptcy Court in Michigan concerning the Debtor's homestead right in his Florida residence were legally sound and valid. These issues should be considered in the pending appeal and not by this Court.

█ ' The Debtor, in order to escape the overwhelming adverse effect of the facts and the controlling legal principles based on those facts, urges that Chapter 11 is remedial and the he should be given an opportunity to attempt to achieve reorganization especially because the Debtor did not delay and procrastinate the reorganization process. He has already filed his disclosure statement and his plan of reorganization, although the initial plans were clearly non-confirmable. The Debtor amended the plans and currently has his Third Amended Plan (Doc. No. 269) before this Court. He claims to be ready to go to confirmation and claims that he is entitled to attempt to obtain confirmation of the Third Amended Plan. Notwithstanding the teachings of *Natural Land, supra,* this Court is of the opinion that the Debtor should have one opportunity to attempt to obtain confirmation of the Third Amended Plan, provided that the plan may be amended only at the confirmation hearing through an order of confirmation, and that the confirmation hearing will not be rescheduled to allow for a Fourth Amended Plan.

Accordingly, it is

ORDERED, ADJUDGED AND DECREED that Motion to Dismiss (Doc. No. 145) and the Amended Motion to Dismiss

(Doc. No. 153) be, and the same are hereby, denied without prejudice. It is further

ORDERED, ADJUDGED AND DECREED that the hearing to consider the Third Amended Disclosure Statement and all objections interposed shall go forward as scheduled on June 10, 2004, beginning at 11:00 a.m. Unless the Debtor can overcome the objections to the Third Amended Disclosure Statement or modify the Third Amended Disclosure Statement at the hearing to have the same approved by this Court and to have the Third Amended Plan set for confirmation, this case shall be dismissed.